

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-12-00081-CR
_____

THE STATE OF TEXAS, Appellant

V.

KIMBERLY LYNN COOK, Appellee

On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 21,571-2012

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

The trial court granted Kimberly Lynn Cook's motion to suppress evidence, and the State has appealed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a) (5) (West Supp. 2012). We have reviewed a video recording from the scene showing the traffic stop that led to seizure of the alleged contraband, the record of the suppression hearing, and the briefs of the parties. Deferring to the trial court's findings on factual matters and witness credibility, we affirm.

## I.    The Traffic Stop

Quitman Police Officer Robert Holland was in the process of getting a warrant for Cook—the warrant charged her with the offense of credit card abuse—when he saw Cook driving around Quitman. Holland contacted Officer Miles Tucker and asked Tucker to keep Cook under observation until Holland could secure the warrant. Tucker pulled Cook over in a traffic stop; a camera in the dash of Holland's police vehicle made a video recording which shows Holland arriving at the scene of the traffic stop on Sissy Spacek Drive, where Tucker's police SUV was parked behind Cook's truck. The video recording shows Holland, Tucker, and one other officer approaching Cook's vehicle, which cannot be seen because of Tucker's police truck. The audio recordings from inside Holland's police car and the officers' body microphones are of varying quality:   some statements can be clearly heard; many cannot. Our summary of the events during the traffic stop is based on testimony from Holland and Tucker at the suppression hearing and the video recording from Holland's police car.

Cook was informed of the warrant and that she would be arrested. It is not possible to clearly understand all of the discussion on the video recording, but Cook can be heard telling

2

officers that her passenger, whom police identified as Travis Holder-Herrera, was "one of her dearest friends," but she said he did not have a license. At neither this point nor any other can we determine whether police directly asked Cook if she would like her truck tendered to Holder-Herrera. A few minutes later, though, after Cook had been put in Holland's police car, the audio recording shows that the officers asked Holder-Herrera himself whether he had a driver's license, to which he answered that he did. That answer appears to be confirmed by the officer's next question, "An actual driver's license," and follow-up questions including, "Is it suspended?" Tucker acknowledged that he talked to Holder-Herrera, but at the hearing, he could not recall "if he had a driver's license." Likewise, Holland, when asked if he inquired of Holder-Herrera "as to the status of his license," responded, "I don't recall that." The rest of the exchange cannot be clearly discerned, and nothing in the record establishes whether or not Holder-Herrera had a valid driver's license on the date of the stop. At the hearing, Tucker said that he "never could get a complete clarity of what the status of [Holder-Herrera's] driver's license was."

After Cook was placed in Holland's police car, Holder-Herrera apparently remained in or right by Cook's truck; about nine minutes after Cook was taken into custody and put in the police car, one officer can be heard talking to Holder-Herrera saying something about "arrest you or not." Holder-Herrera is asked if he has any weapons on him and can then be seen, with his hands cuffed behind his back, being taken away from Cook's truck out of the camera's frame. At the suppression hearing, Tucker said that Holder-Herrera was arrested on outstanding warrants from the City of Quitman. Eventually, though, Holder-Herrera was released and, according to Tucker, he walked to city hall to take care of his traffic tickets.

3

We arrive now at the point of contention. The State contends the officers properly commenced an inventory search of Cook's truck. Cook was under arrest, and the State argues the lack of clarity regarding Holder-Herrera's driver's license meant that there was no alternative to impounding the truck to ensure the vehicle's protection. Less than a minute after Holder-Herrera was cuffed and moved away from the truck, one officer (who appears to be Tucker, based on statements made at the suppression hearing and the activities seen on the video recording) found a small baggy of "contraband" in the center console of Cook's truck—field tests suggested the contraband in the baggy was methamphetamine.

Within two minutes of the officer carrying the plastic bag of contraband, two officers are discussing the situation. One said, "I'm just trying to figure out how I'm gonna justify getting in there and finding it . . . the only way to do that is off an inventory." Holland acknowledged that he told Tucker, after the contraband was found, that the only way to justify it was by an inventory search. A few seconds later, one officer stated that Holder-Herrera has "city warrants" and thus officers "are gonna have to do an inventory." One officer states he has not told Holder-Herrera if he would be going to jail. There is further discussion that suggests officers had spoken to a woman named Mary at the city offices and possibly that Holder-Herrera had previously spoken with her, and Holder-Herrera was at that time on his way to pay his tickets. One officer said he spoke with Mary who indicated it was officers' "discretion," which in the context of the conversation seems to indicate the officers had discretion on whether to arrest Holder-Herrera.

Holder-Herrera was allowed to walk away from the scene, and it is unclear whether Cook's truck was towed. The video runs continuously, and about forty minutes after the above

incidents, the police car carrying Cook arrives at the police station. Cook is then heard identifying her truck that is parked in front of the station. Before leaving the scene, through sobs, Cook apparently asks the officer if she can call someone to come get the truck and states that she has a friend living down the street. Officer Holland tells Cook that, because Holder-Herrera has warrants, there is "no one here to drive your truck." The status of Holder-Herrera's driver's license is not discussed any further.

## II. Review of Suppression of Evidence

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006). When application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review de novo the trial court's rulings on those questions. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005).

5

### III.    Requisites of an Inventory Search

An "inventory search"[1] is a motor-vehicle search conducted as part of the impoundment process that is designed to produce an inventory of a vehicle's contents. *See Moskey v. State*, 333 S.W.3d 696, 700 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Inventory searches have several legitimate purposes—to protect the vehicle owner's property while the vehicle is in custody, to protect the police against claims or disputes over lost or stolen property, and to protect the police from potential danger. *Id.* An inventory search must be conducted in good faith and pursuant to reasonable, standardized police procedure. *Id.* The State bears the burden of establishing that an inventory search was lawful. *Id.* It may satisfy its burden by showing that (1) the driver was arrested, (2) no alternatives other than impoundment were available to ensure the vehicle's protection, (3) the impounding agency had an inventory policy, and (4) the policy was followed. *Garza v. State*, 137 S.W.3d 878, 882 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986) (one instance in which automobile may be validly impounded and inventoried is where driver removed from vehicle and arrested and no alternative to impoundment is present for vehicle's protection).

### IV.    Trial Court Findings, Conclusions

The trial court made a factual finding that "[a]t the time[] Captain Tucker searched the vehicle, it was not in the lawful custody of Quitman Police Department." The court further found:

---

[1]An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

6

9.     After finding the methamphetamine, Captain Tucker told Officer Holland the only way they could justify the search was by "inventorying" the vehicle. This conversation was recorded by the body microphone worn by Officer Holland and on the video camera located in his patrol vehicle.    Officer Holland authenticated the video (and audio) recording.[2]

10.     Travis Herrera-Holder,[3] the passenger in Defendant's vehicle, a person over the age of 18 years, was found to have traffic warrants in the City of Quitman.    He was not arrested, but, was directed to walk to Quitman City Hall and make arrangements to pay his tickets.    No evidence was introduced by the State to show that Herrera-Holder was not available to take possession of Defendant's vehicle as a reasonable alternative to impounding Defendant's vehicle.

In ruling on the motion at the conclusion of the suppression hearing, the trial judge expressed

concern about the order of events as depicted in the video:

The court is concerned with the order of events that I heard on the tape and the degree of discretion that seemed to be exercised for the purpose of establishing the inventory rather than faced with an alternative not to do the inventory and that the burden is on the State to show that it was lawfully done, and that's where I really come down to the fact of hearing the burden of proof and the ambiguity of the timeline on that.

I can't reach the confidence that search the express -- in the order of events he had there, but I can't say that it's clear in any way when these decisions were made, and it does appear that the whole business with the -- again, I can't tell from the tape whether the other person had a license or did not. There was certainly some indication that he didn't.    On the other hand, much later in the tape, there was a discussion as to the whole business of whether checking with the city about the warrant.    That conversation certainly came after it appeared that the methamphetamine had been found, whether the conversation with the city about those warrants occurred is impossible to determine, and if they had been and that

---

[2]The State disputes this authentication, claiming in its brief the "inventory" statement was made by Holland, not Tucker; the State also argues that "there is no evidence in the record that Holland wore a body microphone or that he authenticated the recording" and "[t]he recording was admitted by stipulation."    It is true that from his testimony at the suppression hearing, it appears Holland made the quoted statement, but we do not see how this fact or the issue of who was wearing a body microphone is relevant to the point at hand, i.e. consideration of the evidence before the trial court at the suppression hearing and what findings the court could have made based on that evidence.

[3]Tucker identified Cook's passenger as Travis Holder-Herrera, and we have used that surname in this opinion.

7

> there had already been a decision made to -- well, even there if the decision is to let him walk to the city to take care of it, there's no reason why he couldn't have driven.

The trial court then granted Cook's motion to suppress. When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

The State bore the burden of proving officers legally impounded Cook's car. The trial court essentially ruled that the State failed in this proof when it found that at the time of the search, the truck was "not in the lawful custody of [the] Quitman Police Department." As discussed above, one of the things necessary for the police to show a lawful impoundment was that the defendant was arrested and there was no licensed driver with whom they could entrust the truck. It is true the record does not conclusively establish Holder-Herrera had a valid driver's license, but he can be heard on the video saying he did have a license. Even though this issue of whether Holder-Herrera had a valid driver's license was important in determining his availability to drive the car, both officers testified they did not remember Holder-Herrera's answer to that question. Neither of the testifying officers stated whether they made a definite determination. Tucker testified he "never got a clear answer" about the status of Holder-Herrera as a licensed driver. But the trial court was also clearly "concerned with the order of events heard on the tape and the degree of discretion" exercised by the officers at the scene in conducting the inventory

8

rather than investigating alternatives.[4]  In making his ruling from the bench, the trial judge also noted the inconclusive testimony regarding Holder-Herrera's license status and that Holder-Herrera was ultimately allowed to walk to the city building to address his warrants.  The trial court commented that "there's no reason why he couldn't have driven."

The trial court's conclusion that the appellant's vehicle was not lawfully impounded is supported by the following evidence:

> (1)  The search took place before a determination was made that an inventory was necessary;
>
> (2)  The statement of the officer attempting to justify an inventory search after the contraband was found;
>
> (3)  The passenger, Holder-Herrera, was not arrested and was allowed to walk away from the scene; and
>
> (4)  After the contraband was found, there was no further inventory of the vehicle.

According to Tucker, the vehicle was not released to Holder-Herrera because (1) the officers were unsure of the status of his driver's license, and (2) the officers wanted to make sure he resolved any outstanding warrants.  As the trial court noted, since Holder-Herrera was released to walk to city hall to pay his tickets, he could just as well have driven the vehicle.  Secondly, the State never showed any attempt to determine if Holder-Herrera had a valid driver's license other than to ask Cook and Holder-Herrera.  Even though both police officers had forgotten the answer given by Holder-Herrera, the audio recording indicates he answered that he had a driver's license, at which time the officers attempted to quiz him further if he had an "actual" license and

_____

[4]The police are not required to "independently investigate possible alternatives to impoundment, absent objectively demonstrable evidence that alternatives did, in fact, exist."  *Mayberry v. State*, 830 S.W.2d 176, 180 (Tex. App.—Dallas 1992, pet. ref'd).

if it was suspended.  The unusual forgetfulness of the officers on such a key issue very well may have affected the trial court's evaluation of their credibility.  The trial court was within its discretion to find that the two reasons given by Tucker for failing to release the vehicle were not established.

We defer to the trial court's findings on the facts and evaluation of credibility.  We overrule the State's point of error.  We affirm the trial court's ruling.


Jack Carter
Justice


Date Submitted:    November 26, 2012
Date Decided:      December 5, 2012

Publish